UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

| | |
|---|---|
| JENNA HOSCHKE, DEVON AUERBACH, TARA INZINNA, and CHRISTINA RIVERA, | **DECLARATION OF DAVID CROWE** |
| Plaintiffs, | Case No. 23-cv-06059-JMW |
| -against- | |
| BELFAST GASTRO PUB INC., DAVID CROWE, an individual, ROBERT FORTIER, an individual, | |
| Defendants. | |

------------------------------------------------------------------X

DAVID CROWE, affirms under penalty of perjury that the following facts are true and correct:

1. I am fully familiar with the facts and circumstances herein from my own personal knowledge and based upon the books and records of Defendant, BELFAST GASTRO PUB INC. ("BELFAST"), that are created, kept, and maintained in the regular and ordinary course of BELFAST'S business on or about the dates set forth thereon. I submit this Declaration in support of Defendants' Motion to Dismiss and/or for Summary Judgment.

2. I am originally from Limerick, Ireland and presently live in County Clare with my wife, Taly, my son, Evin, and my daughter, Fiona. During the school year, I split my time between Ireland and the United States, and then live primarily in the United States during the summer months.

3. I am the owner of Defendant, BELFAST, an Irish gastropub located at 101 North Wellwood Avenue, Lindenhurst, New York 11757. BELFAST opened its doors on or about March 5, 2021. Being from a different country, I met with my long-time accountant, Erika L. Calderon, prior to opening BELFAST to seek her advice and counsel as to the current laws regarding such things as minimum wage for tipped employees, the documents necessary to be included in new hire paperwork, and other necessary information related to the formation of my new business. Also present during this meeting was BELFAT's then Banquet Manager- Anne Marie Fragkoulis, General Manager- Brian Gems, and ROBERT FORTIER ("BOBBY"), my long-time friend who often looks after things while I am in Ireland with my family. The employees of BELFAST were always compensated in accordance with the advice that I received from Ms. Calderon, which I relied upon in good faith to be compliant with all applicable local, state and federal laws. Ms. Calderon also maintained BELFAST'S payroll documents, prepared its payroll records, such as paychecks stubs, in addition to the preparation and filing of BELFAST'S payroll taxes and corporate tax returns.

4. The kitchen at BELFAST is open from 11:30 A.M. to 9:00 P.M. on Sundays, from 12:00 P.M. to 10:00 P.M. on Monday through Thursday, and from 12:00 P.M. to 12:00 A.M. on Friday and Saturday. Waitresses who were scheduled to work the lunch shift worked a five (5) hour shift, either 11:00 A.M. to 4:00 P.M. or 12:00 P.M. to 5:00 P.M. Restaurant employees who were scheduled to work the evening shift similarly worked a five (5) hour shift, from either 4:00 P.M. to 9:00 P.M. or 5:00 P.M. to 10:00 P.M.

5.     Plaintiff, JENNA HOSCHKE ("HOSCHKE"), worked for BELFAST as a waitress in the restaurant from March 2021 until May 2023.  HOSCHKE'S duties as a waitress included taking food and drink orders, serving food and beverages to customers, collecting cash and credit card payments from customers, and performing side work at the beginning and end of her shift.  HOSCHKE was typically scheduled to work five (5) hour shifts on two (2) to five (5) days per week, for an average of ten (10) to twenty-five (25) hours worked per week.  HOSCKE never worked more than forty (40) hours in one week during the brief period that she worked for BELFAST.  In fact, HOSCHKE rarely ever worked the full shift that she was scheduled to work as she would routinely arrive to work late or leave early, and HOSCHKE would also frequently call out on nights when she expected the restaurant would be "dead", after claiming that she or her dog were ill. *(See Hoschke's Payroll and Time Records, attached hereto as Exhibits "A"; Notes from Hoschke's Personnel File, attached hereto as Exhibit "B")*  HOSCHKE'S payroll and time records attached hereto as Exhibit A were created and maintained in the regular and ordinary course of BELFAST'S business on or about the date set forth thereon.  The notes in HOSCHKE'S personnel file attached hereto as Exhibit B were created and maintained in the regular and ordinary course of BELFAST'S business on or about the date set forth thereon.  Other than volunteering to work a funeral for an employee's mom and one political fundraiser, HOSCHKE did not work banquets as BELFAST had a dedicated banquet staff and HOSCHKE was not part of that staff.

6.     Plaintiff, TARA INZINNA ("INZINNA"), worked as a waitress in the restaurant for BELFAST from approximately March 2021 until July 2023.  INZINNA had

the same job duties as HOSCHKE. INZINNA was typically scheduled to worked one (1) to two (2) five (5) hour shifts on three (3) to six (6) days per week, for an average number of hours worked per week of thirty-two (32) to forty-eight (48) hours. *(See Inzinna's Payroll and Time Records, attached hereto as Exhibits "C")* INZINNA'S payroll and time records attached hereto as Exhibit C were created and maintained in the regular and ordinary course of BELFAST'S business on or about the date set forth thereon. INZINNA also did not work any banquets other than the same two functions that HOSCHKE worked as she was also not part of BELFAST'S banquet staff.

      7.      INZINNA began stealing from BELFAST from her first day of employment. INZINNA would use the kitchen as her personal pantry, stealing produce, condiments, food, seasoning, etc. despite being repeatedly told to stop as it was stealing. Employees were given discounted meals during their shift, but INZINNA would bring in lettuce for a salad then shop the pantry and cooler to top her salad which she was not permitted to do. INZINNA would also annoy the kitchen staff into making her food for free or would ring up food items then later falsely claim that it was a "miss ring" to steal and consume the food item without paying for it.

      8.      INZINNA stole not only from BELFAST, but she also stole from her co-workers. INZINNA borrowed money from BOBBY which she never paid back. INZINNA also stole tips from her coworkers. The tipped employees at BELFAST pool their tips and then divide them evenly at the end of each shift. INZINNA would often volunteer to count and divide the money, but would thereafter steal money from her co-workers portion of the tip pool. Several employees complained during the course of her

employment that INZINNA was stealing money from the tip pool that belonged to them. In addition thereto, INZINNA would often leave early when the restaurant was slow, then demand an equal share of that evening's tip pool even though she did not work a full shift, which angered her co-workers.

9. While the above theft was enough to fire INZINNA, everything came to a head after I hired a spotter to go into the pub to observe what happened when I was not there as I split my time between Ireland and the United States. If you have ever seen the television show "Bar Rescue", you know what a spotter is. A spotter is essentially a restaurant private detective whose job is to frequent a bar or restaurant establishment on one or more occasions posing as a customer. The spotter's job is to observe such things as whether employees are doing their jobs effectively, whether employees are stealing from the business by giving away food and/or drinks for free and whether the bartender is overpouring drinks. While the spotter was present at BELFAST, several employees, INZINNA and HOSCHKE included, were observed frequently giving food and drinks away for free. In fact, the spotter was given several drinks for free even though no one had ever seen the spotter at BELFAST before, indicating that the theft was not just in relation to "regulars," friends and family, but that Plaintiffs and other employees were so blatantly stealing from BELFAST that they were essentially giving the farm away to every person who walked in the door. *(See Spotter Report, attached hereto as Exhibit "D")* The Spotter Report attached hereto as Exhibit D was created for BELFAST in the regular and ordinary course of BELFAST'S business. The Spotter Report attached hereto as Exhibit D was maintained in the regular and ordinary course of BELFAST'S business.

The Spotter Report attached hereto as Exhibit D was created on or about the date set forth thereon.

10. The spotter's report led me and my management team to being a full blown investigation where we looked more closely at the security camera footage, interviewed the kitchen staff and other employees, and the entries made on the point of sale system in an attempt to see how bad the theft had become. In watching the footage, we saw INZINNA stealing food and alcoholic beverages both during and after work. The Security Footage, attached as Exhibit G, was taken and maintained in the regular and ordinary course of BELFAST'S business on or about the date set forth thereon. Seeing INZINNA steal from me was very hurtful because she asked me to vouch for her that she was not drinking to help her get her kids back after her husband threw her out for being a drunk. Yet, there she was on the cameras hiding behind a dishrack drinking white wine that she had stolen from the bar when she was not supposed to be drinking by court order. To think that I even talked to my wife, Taly, about giving this woman a place to stay after her husband threw her out and she is stealing from me. Things only got worse from there.

11. The point-of-sale system revealed that HOSCHKE, INZINNA and a few other employees had memorized the manager's codes and were using them to void items off of checks to get bigger tips, to aid them in stealing food and drinks from BELFAST, and even misused the managers' codes to void entire checks after customers paid in cash so they could pocket the money that belonged to BELFAST. *(See Hoschke's Point-of-Sale System Records, attached hereto as Exhibit "E"; Inzinna's Point-of-Sale System Records, attached hereto as Exhibit "F")* The Point-of-Sale System Records, attached as Exhibits

E and F, were created and maintained in the regular and ordinary course of BELFAST'S business on or about the date set forth thereon. What tipped us off is that the manager codes were being used on dates and times when that manager was not in the building either because they did not work that day or shift and/or were otherwise ill or on vacation. The managers had to change their codes as a result of the discovery of HOSCHKE and INZINNA'S theft. HOSCHKE stole over $1,000.00 and INZINNA stole over $5,000.00 from BELFAST by using the manager's codes to void out all or part of customer's checks in addition to the other food and drinks that they stole by simply not ringing them. *(See Exhibits E and F)*

      12.    Both HOSCHKE and INZINNA were further observed on the security cameras not entering food and drinks items for customers so they would leave bigger tips. They would also enter orders in wrong so they would be voided, the customers would save money and leave bigger tips, and the HOSCHKE and INZINNA could eat the food. We also saw them stealing food and drinks from BELFAST for their personal consumption both during and after their shifts. *(See Fragkoulis Declaration, ¶5, attached hereto; Still Frame of recording of Inzinna consuming stolen wine while hiding behind a dishrack during her shift, attached hereto as Exhibit "G")* Indeed, on April 27, 2023 when I ended up in the hospital after becoming injured at BELFAST, my Banquet Manager, Anne Marie, logged into the BELFAST security cameras from the hospital to check on things and observed HOSCKE and INZINNA stealing food and drinks from the bar while I lay unconscious in a hospital bed. *(See Fragkoulis Declaration, ¶5, attached hereto)*

13. After completing the investigation, several employees, HOSCHKE and INZINNA included, were fired for employee theft. While I do not recall HOSCHKE ever apologizing for stealing from me, INZINNA did send me a message shortly after she was fired for stealing to thank me for everything that I have done for her. It is my understanding that INZINNA ran into my Banquet Manager, Anne Marie, at the beach shortly after she was fired, apologized for what she had done and asked Anne Marie for forgiveness. Anne Marie told her that she needed to apologize to me, not her, as she stole from me. I received a text message shortly thereafter, on July 18, 2023, stating "Thank you for all you have done for me. I appreciate it!" *(See Text Message from Inzinna to David Crowe, dated July 18, 2023, attached hereto as Exhibit "H")* INZINNA also sent a similar message to BOBBY on July 18, 2023, stating:

> @ 2:15 P.M.: "Hi. Its Tara. Can you call me when you have a moment please."

> @ 3:40 P.M.: "No need to call i get it. Just wanted to say thank you for everything you have done for me the past 2 and a half years!"

*(See Text Message from Inzinna to Robert Fortier, dated July 18, 2023, attached hereto as Exhibit "I")* The text messages attached hereto as Exhibits H and I were maintained in the regular and ordinary course of BELFAST'S business and were created on or about the date set forth thereon.

14. Apparently, INZINNA did not appreciate all that I had done for her over the years or that I did not have her and the other employees arrested for theft as they filed a Complaint with the New York State Department of Labor ("NYS DOL") and the instant

lawsuit shortly after being fired for stealing. *(See New York State Department of Labor Notice of Revisit, dated February 21, 2024, attached hereto as Exhibit "J")*

15. As I did not feel that I had anything to hide as I believed that I was in compliance with all the labor laws, I fully complied with the audit conducted by the NYS DOL which covered the entire period that Plaintiffs, INZINNA and HOSCHKE, worked for BELFAST as it covered the period from when BELFAST opened on March 5, 2021[1] through February 18, 2024. *(See Letter from New York State Department of Labor with revised Recapitulation Sheet, dated February 24, 2025, attached hereto as Exhibit "K")* At the conclusion of the audit, I paid whatever the NYS DOL determined was due to my employees, including Plaintiffs INZINNA and HOSCHKE, as I always intended to and did believe that I was paying my employees properly. *(See Exhibit K; Letter to New York State Department of Labor with proof of payment, attached hereto as Exhibit "L"; Email from New York State Department of Labor acknowledging payment and that the matter was now closed, attached hereto as Exhibit "M")*

16. As I have paid everything that has been determined to be due HOSCHKE and INZINNA after a full and complete audit, it is respectfully submitted that this matter should be dismissed as no active case or controversy exists in this case as HOSCKE and INZINNA have been paid. HOSCKE and INZINNA admit in their Amended Complaint that they decided to litigate this matter on two fronts, both here and with the NYS DOL, and they should not be entitled to double recovery by their choice to bring their claims

---

[1] The NYS Dept. of Labor documents state that the audit period is from 2/18/21-2/18/24, however, Belfast did not open until March 5, 2021.

simultaneously through both an administrative and a judicial proceeding. *(See Complaint, dated August 10, 2023, Doc. No. 1; First Amended Complaint, ¶¶ 49-50, attached hereto as Exhibit "N")*

17. As to the specific claims made in the First Amended Complaint, HOSCHKE and INZINNA claim in their First Cause of Action that they were supposedly paid below the applicable minimum wage for a tipped employee under the Fair Labor Standards Act ("FLSA") which is contradicted later in the Complaint where they admit that they were paid $5.00 per hour, or $25.00 per shift, which is more than double the FLSA minimum wage. *(Compare ¶¶ 9, 15 and 61 in Exhibit N)* Even without these admissions, HOSCHKE and INZINNA no longer have any claim under FLSA as a result of the NYS DOL audit as they have now been paid everything to which they were found to be entitled under the greater tipped employee minimum wage of $10.00 per hour required by the New York Labor Laws ("NYLL").

18. HOSCKE and INZINNA'S claims that they were supposedly not paid the proper tipped employee minimum wage under the NYLL [Third Cause of Action], overtime under FLSA and NYLL [Second and Fourth Causes of Action], or Spread of Hours Pay under the NYLL [Seventh Cause of Action] were similarly extinguished as a result of the NYS DOL audit as all of those claims were explicitly investigated by the NYS DOL and any sums due HOSCHKE and INZINNA under all of these claims have now been paid. Moreover, it should not go unnoticed that HOSCHKE had no claim for unpaid overtime or spread of hours pay in relation to her employment at BELFAST as she never worked ten (10) or more hours in one (1) day or more than forty (40) hours in one

(1) week.  The NYS DOL audit further extinguished any and all claims under the WTPA [Fifth and Sixth Causes of Action] as the NYS DOL similarly considered the foregoing claims and imposed the penalties they deemed appropriate for these and other claims made by HOSCHKE and INZINNA in the audit.

19. HOSCHKE and INZINNA'S claims in their Eighth and Ninth Causes of Action have no merit at all as they are contradicted by the actual law.  More particularly, HOSCHKE and INZINNA claim in their Eighth Cause of Action that they supposedly suffered damages because BELFAST lawfully deducted the credit card transaction fee when customer's tipped on a credit card ---as is *permitted* by the FLSA and NYLL and, thus, cannot give rise to any claim for damages. (See NYS DOL: Tips and Gratuities Frequently Asked Questions, https://dol.ny.gov/system/files/documents/2025/01/tips-and-gratuities-frequently-asked-questions.pdf, attached hereto as Exhibit "O"; US DOL Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA), https://www.dol.gov/agencies/whd/fact-sheets/15-tipped-employees-flsa, attached hereto as Exhibit "P")  HOSCHKE and INZINNA next claim that BELFAST supposedly charged both them and the customer for the credit card transaction fee on their tips, which is false because that is not how things work in the restaurant industry as anyone who has ever eaten in a restaurant should well know.  When a customer leaves a credit card to pay a bill, *only* the amount of the bill plus any transaction fee on the amount of the bill is charged to their credit card at that time and the credit card slip is thereafter brought back to the customer to indicate whether they would like to *also* leave as a tip on their card and to sign the credit card slip authorizing such payment.  If a $5.00 tip was added on the

credit card slip, then $5.00 (not $5.15) was entered into the credit card machine as the added tip authorized by the customer. As the FLSA and NYLL permit an employer to deduct the credit card transaction fee from a credit card tip, the same was properly deducted from HOSCKE and INZINNA'S credit card tips and they have no damages.

20. In their Ninth Cause of Action, HOSCHKE and INZINNA similarly complain that they did not receive any portion of the administrative fee charged to banquet customers for events held at BELFAST. It should be noted at the onset that neither INZINNA nor HOSCHKE were banquet servers, thus, they did not work banquets as detailed in ¶¶ 4, 9-11, of the Declaration of Anne Marie Fragkoulis attached hereto. Even if they did, banquet employees are not entitled any portion of the 20% administrative fee charged for banquet functions as a matter of law as neither the FLSA and NYLL require that an administrative fee be paid to tipped employees where it is clear on the service contract that this an administrative fee and not a tip. *(See Catering Banquet Event Package Menu Form, attached hereto as Exhibit "Q"; Exhibits O, P, and R)* As our catering contract (used for all catering events, banquets, fundraisers, etc.) in effect during the relevant period herein clearly indicates that the 20% is an administrative fee and not a gratuity, which is to be paid separately, neither HOSCHKE nor INZINNA were entitled to any portion of the administrative fee and, thus, their Ninth Cause of Action similarly fails to state a claim upon which relief may be granted. *(See Exhibits Q and R)* The Catering Banquet Event Package Menu Form, attached as Exhibit Q, is a true and accurate copies of the Catering Banquet Event Package Menu Form BELFAST used during all relevant periods herein. It is in the regular and ordinary course of Defendants'

business to maintain a document such as this. The document attached as Exhibit Q was was created and maintained in the regular and ordinary course of Defendants' business on or about the date set forth thereon.

21. HOSCKE and INZINNA'S Tenth and Eleventh Causes of Action alleging retaliation under the FLSA and NYLL make no sense whatsoever, particularly when they both know that they were fired for stealing. This is especially true for INZINNA who apologized to Anne Marie for stealing and who sent a text message to me and BOBBY right after she was fired *thanking* us for everything that we did for her. If INZINNA was supposedly fired in retaliation for complaining about unlawful payroll practices, then why is she thanking me and BOBBY for all that we did for her in the two years that she worked for me? It makes no sense and her text message contradicts what she is now claiming in ¶¶ 10 and 11 of the First Amended Complaint.

22. The truth is that neither INZINNA nor HOSCHKE, or any other employee, ever complained to anyone in management at BELFAST that they thought they were not being paid properly and they both know that they were fired after the spotter caught them stealing from me which caused an investigation into several employees and resulted in their termination. In reality, both INZINNA and HOSCHKE stole tens of thousands of dollars from BELFAST by stealing cash payments from customers and giving away my food and drinks for free. I should not have been surprised that INZINNA was stealing from me because, while she was working at BELFAST, she was apparently arrested for stealing from her prior employer and her mom had to pay restitution to keep her out of jail. I should be suing them, they should not be suing me. I should be pressing criminal

charges against them like INZINNA'S prior employer. I was willing to let their thievery go, but now this and the audit?

23. It is also important to note that neither INZINNA nor HOSCHKE claimed that they were supposedly fired in retaliation for complaining about unlawful payroll practices when they originally filed this lawsuit in August 2023, *weeks after INZINNA was fired*. In fact, it was not until more than a year later, or in November 2024, when INZINNA and HOSCHKE first claimed that they were supposedly fired in retaliation for complaining about unlawful payroll practices. Why did they suddenly have this epiphany about supposedly being retaliated against sixteen (16) months after the lawsuit was filed?

24. INZINNA has it in her head that I am cooperating with her husband, Patrick, who recently filed for divorce and who has custody of their kids. Her husband came to BELFAST in or about April 2023 asking to speak with me and some of my staff to see if anyone was willing to testify against INZINNA in relation to her alcohol abuse during and after work to use against her in their custody proceedings. I told Patrick that I did not want to be involved especially with this lawsuit pending. One of my current employees is friends with INZINNA and apparently reported back to INZINNA that her husband had come to the pub looking for witnesses to testify against her in family court. INZINNA reportedly went ballistic and told the employee that she intended to bring a bogus sexual harassment and retaliation claim against me to "ruin me" like she thought I was doing to her by cooperating with Patrick. That employee apparently told INZINNA that it was wrong to try to ruin my life and my marriage as revenge for me supposedly cooperating with her husband. After speaking with INZINNA, the employee called my

wife, Taly, on or about April 19, 2024 to warn Taly that INZINNA intended to make false allegations against me in retaliation for me allegedly cooperating with her husband, which I was not. After the case did not settle at the two mediation sessions held in the summer, INZINNA and HOSCKE filed a bogus complaint against me in state court claiming sexual harassment and retaliation and also amended the Complaint here to claim retaliation more than a year after filing this lawsuit. Another employee recently spoke with INZINNA about why she was continuing with this nonsense and INZINNA reportedly responded that she was "in too deep" to drop these cases now.

25. HOSCHKE apparently now works for a place that shares the parking lot with BELFAST and she also ran into an employee recently who questioned why she was part of these lawsuits especially after she got paid by the NYS DOL. HOSCHKE reportedly responded that she was not a party to the sexual harassment lawsuit, that was INZINNA and the other girls, and could not answer why she was continuing with this lawsuit after she had already been paid everything she was entitled to.

26. The allegations in the Amended Complaint made by HOSCKE in relation to the alleged retaliation claims make no sense. HOSCHKE claims in the Amended Complaint that I supposedly called her a "c***" in April 2023, which is a word that I just do not use. *(See Exhibit N, ¶ 50)* HOSCHKE'S claim further makes no sense as she claims that I called her the "c" word in April 202**3** as a result of learning about the NYS DOL audit filed nearly a year later on February 15, 202**4** that I was not notified about February 21, 202**4**, so how could that be? *(Compare Exhibit N, ¶¶ 49-51 with Exhibit K, pp. 1, 24)* Moreover, if I was so enraged in April 2023 about an audit that would not be

filed for ten (10) months that I supposedly called her the "c" word, why did I not fire her then? Why was she not fired until May 2023? The audit did not conclude until February 24, 202**5**, so clearly it was not about waiting out the audit. *(See Exhibit K)* I guess Tara and Jenna failed to pay attention to details like dates when they concocted these new claims of sexual harassment and retaliation as HOSCKE also claims in the State Court Action that she supposedly witnessed me sexually harassing INZINNA during a time that it is documented that I was in Ireland, thus, could not have been at BELFAST. I believe the saying that is pertinent here is "Oh, what a tangled web we weave when first we practice to deceive" as their lies are coming to light due to carelessness when with which they came up with their stories.

27. The actual fact of the matter is that I always believed that I was complying with the letter of the law, which is why I fully cooperated with the NYS DOL audit and vowed from the beginning to pay any money they said that I owed to my workers as it was and is my honest to God truth that I will and have always done right by my workers. In fact, over the years, I have often built pubs that I later sold to my employees, setting them up for success on the foundation that I built.

28. In the audit, I gave the NYS DOL everything, including records totaling 1,305 pages. As I had turned over so many records to the NYS DOL, the audit took about a year to complete as I am sure it took some time to get through all of the books and records that I provided and to interview the employees. More specifically, as indicated on the Letter and Amended Recapitulation Sheet (Exhibit K) the NYS DOL audit reviewed, analyzed and made a determination as to what, if anything, was owed to

all employees, HOSCKE and INZINNA included, related to minimum wage, overtime, spread of hours, wage notices, and tip allocations and thereafter I paid everything they said was owed to the employees. Some employees only got a few dollars as there was apparently a couple of months delay in realizing that the minimum wage had gone up from $14.00 per hour to $15.00 per hour, while other employees received a little more. At the conclusion of the audit, the NYS DOL thanked me for my willful compliance with the audit and prompt payment once a determination had been made. *(See Exhibit M)* The NYS DOL Letter and Amended Recapitulation Sheet, attached as Exhibit K, are true and accurate copies of the Letter and Amended Recapitulation Sheet that Defendants received from the NYS DOL. It is in the regular and ordinary course of Defendants' business to maintain a document such as this. The Letter, paycheck stubs and check tendered to the NYS DOL as payment for the sums deemed due, attached as Exhibit L, were created and maintained in the regular and ordinary course of Defendants' business on or about the date set forth thereon.

29. As HOSCKE and INZINNA have been paid everything the independent organization created to enforce the more protective New York Labor Laws determined was owed to them, so I am not sure why this case is continuing.

WHEREFORE, Defendants respectfully request that this Court dismiss Plaintiffs' First Amended Complaint and/or grant summary judgment in favor of Defendants as no active case or controversy remains in this matter as HOSCKE and INZINNA have been paid everything that they have been deemed to be owed, plus such other, further and different relief as may seem just, proper and equitable under the premises.

Dated: Lindenhurst, New York
       July 31, 2025

                                                _____
                                                DAVID CROWE